# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**In re: PARAMOUNT LAKE EOLA, L.P. LITIGATION**

**Case Nos.**
**6:08-cv-1247-Orl-28KRS  6:08-cv-1262-Orl-28KRS  6:08-cv-1274-Orl-28KRS**
**6:08-cv-1248-Orl-28KRS  6:08-cv-1265-Orl-28KRS  6:08-cv-1382-Orl-28KRS**
**6:08-cv-1249-Orl-28KRS  6:08-cv-1266-Orl-28KRS  6:08-cv-1383-Orl-28KRS**
**6:08-cv-1250-Orl-28KRS  6:08-cv-1267-Orl-28KRS  6:08-cv-1385-Orl-28KRS**
**6:08-cv-1251-Orl-28KRS  6:08-cv-1268-Orl-28KRS  6:08-cv-1472-Orl-28KRS**
**6:08-cv-1252-Orl-28KRS  6:08-cv-1269-Orl-28KRS  6:08-cv-1626-Orl-28KRS**
**6:08-cv-1261-Orl-28KRS  6:08-cv-1272-Orl-28KRS**

_____

## ORDER

These twenty cases are before the Court on the Omnibus Plaintiffs' Motion for Summary Judgment (Doc. 37 in Case No. 6:08-cv-1247-28KRS).[1] Defendant, Paramount Lake Eola, L.P., has filed a Memorandum in Opposition (Doc. 39) to the motion, and the Court now issues the following ruling thereon.

### I.  Background

During July, August, and October 2005, each of the Plaintiffs in these twenty cases executed a Purchase Agreement (Ex. 1 to each Pl.'s Am. Compl.[2]) for the preconstruction

_____

[1]The same omnibus motion has been filed in each of the twenty cases listed in the caption above.  Unless otherwise noted, all record citations herein are to the docket in the lowest-numbered of these cases, 6:08-cv-1247.

[2]In all but one of the cases, the operative pleading is an Amended Complaint, and each Amended Complaint is substantially the same.  In Case No. 6:08-cv-1626, no amended complaint has been filed; however, the initial Complaint (Doc. 1) in that case is substantially the same as the Amended Complaints in the other nineteen cases.  References herein to the Amended Complaints shall be understood to include the initial Complaint in Case No. 6:08-cv-1626.

purchase from Defendant of a residential condominium in a 313-unit,[3] 17-story building called The Paramount on Lake Eola ("The Paramount") in downtown Orlando. Plaintiffs paid deposits toward their purchases.[4] Before or at the time the Purchase Agreements were signed, each Plaintiff was provided with, inter alia, a Prospectus ("2005 Prospectus," Ex. 2 to each Pl.'s Aff.[5]), advertising brochures (Ex. 3 to each Pl.'s Aff.), and a Property Report[6] (Ex. 1 to each Pl.'s Aff.).

The units were completed in June 2008, and certificates of occupancy were issued on June 26 and 27, 2008. Along with a cover letter dated July 8, 2008, Defendant provided each Plaintiff with an amended prospectus ("2008 Prospectus," Ex. 4 to each Pl.'s Aff.), which differed in some respects from the 2005 Prospectus. In July, August, and September 2008, the Plaintiffs sent letters to Defendant seeking to rescind and terminate their Purchase Agreements. (Rescission Letters, Ex. 5 to each Pl.'s Aff.). In the letters, Plaintiffs asserted various bases for rescission and termination, including, inter alia, alleged negligent construction of the building; violations of the Interstate Land Sales Full Disclosure Act

---

[3]In addition to the 313 residential units, the project also includes four commercial condominium units.

[4]The amounts of Plaintiffs' deposits range from $35,985 (Case No. 08-cv-1249) to $122,985 (Case No. 08-cv-1261). (See Omnibus Mot. at 32-35).

[5]The parties agreed that a single, omnibus motion would be filed in these cases. Although the motion is the same in each case, some details surrounding each case differ. A Plaintiff (in some cases there is more than one Plaintiff) in each case has submitted an affidavit in his or her particular case with attachments pertinent to that particular case.

[6]Plaintiffs state in the Omnibus Motion that the first twenty-seven pages of the Property Report are identical in each case but that the last three pages vary. (See Omnibus Mot. at 2).

("ILSFDA"); and changes made in the 2008 Prospectus that allegedly triggered a 15-day right to cancel under section 718.503, Florida Statutes, and the Purchase Agreements. (Id.).

Defendant responded to Plaintiffs' rescission notices with a half-page letter noting receipt of the rescission and termination letter but advising that Defendant "will not voluntarily rescind the purchase agreement." (Response Letters, Ex. 6 to each Pl.'s Aff.).[7] Defendant explained in its letter: "The subject condominiums are complete and Certificates of Occupancy have been issued by the City of Orlando. Any issues that arose during construction, as alleged in your letter, have been addressed in compliance with all applicable law. [Defendant], therefore, is proceeding to schedule all closings and fully expects that your client will comply with his contractual obligations." (Id.). Plaintiffs did not close on the sales, however; instead, much litigation then ensued.

These twenty cases were filed in July, August, and September 2008.[8] In their Amended Complaints, Plaintiffs allege ten counts against Defendant: Violation of the ILSFDA, 15 U.S.C. §§ 1701-1720 (Count I); Violation of Section 718.503, Florida Statutes (Count II); Violation of Section 718.506, Florida Statutes (Count III); Violation of Section 718.203, Florida Statutes (Count IV); Violation of the Securities Act of 1933, 15 U.S.C. § 77e (Count V); Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),

_____

[7]In one of the cases, Case No. 6:08-cv-1383, no response letter from Defendant has been submitted by the Plaintiffs, and no response by Defendant is noted in the Plaintiff's Affidavit in that case.

[8]The first-filed of the twenty cases at issue here, No. 6:08-cv-1247, was filed on July 28, 2008, and the last, No. 6:08-cv-1626, was filed on September 22, 2008. Many other, similar cases against Defendant are pending in this Court, but those cases are not at issue in this Order.

Section 501.201 et seq., Florida Statutes (Count VI); Fraudulent Concealment (Count VII); Fraudulent Misrepresentation (Count VIII); Fraudulent Inducement (Count IX); and Breach of Contract (Count X). Defendant has filed counterclaims for specific performance and breach of contract based on Plaintiffs' failure to close. (See Doc. 12). Plaintiffs have now moved for summary judgment on Counts I, II, III, VI, and X of their Amended Complaints.

## II. Discussion

### A. Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

### B. The Merits of Plaintiffs' Omnibus Motion

Plaintiffs cast this case as involving a multitude of material omissions and misrepresentations by Defendant that prevented them from "mak[ing] a fully informed decision" about whether to enter into their Purchase Agreements. (Omnibus Mot. at 5 n.1). Defendant, on the other hand, describes Plaintiffs as purchasers who, "arguably at the height of Orlando's real estate boom, contracted to acquire for investment" these condominium units and who, "[n]ow that the real estate market has softened, . . . have refused to honor

their contractual obligations to close on the unit[s] . . . [and] are now in default of those obligations." (Omnibus Mem. in Opp'n at 1). Rather than endorse either of these theories wholesale at this juncture, the Court proceeds to address the omnibus motion on a count-by-count basis, in the sequence presented by Plaintiffs in their motion.

### 1. Count II (Section 718.503, Florida Statutes) and Count X (Breach of Contract)

Plaintiffs first seek summary judgment on Counts II and X, presenting their argument on these two counts together. (See Omnibus Mot. at 6-12). In Count II, Plaintiffs bring a claim for violation of section 718.503, Florida Statutes, and in Count X they allege breach of contract.

Section 718.503, Florida Statutes—part of Florida's Condominium Act—requires that developers include certain language in their sales contracts and furnish certain documents to prospective condominium purchasers. This section provides in part that "[a]ny contract for the sale of a residential [condominium] unit" must contain, inter alia, the following language in conspicuous type: "THIS AGREEMENT IS . . . VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER." § 718.503(1)(a)1., Fla. Stat.[9] The Purchase Agreement that

---

[9]In their Amended Complaints, Plaintiffs also contend as part of Count II that Defendant violated section 718.503(1)(b) "by failing to deliver a compliant prospectus or disclosure statement with all exhibits to the Plaintiff[s]" and by failing to provide "documents which materially alter or modify the offering in a manner that is adverse to the Plaintiff[s]." (See Doc. 13 ¶¶ 90 & 93). However, in their omnibus summary judgment motion Plaintiffs do not argue any failure to comply with this portion of section 718.503. They focus on the

the Plaintiffs signed included this provision. (Purchase Agreement, Ex. 1 to each Pl.'s Am. Compl., § 25).

Plaintiffs allege in Count II that in the 2008 Prospectus, which was sent to Plaintiffs with a cover letter dated July 8, 2008, Defendants "made various material and adverse changes to the offering and the Plaintiff[s] timely voided and terminated the Purchase Agreement[s]." (Doc. 13 ¶ 95). Plaintiffs further allege that despite the timely notices of their intention to terminate their Purchase Agreements under section 718.503,[10]

––––––––––––––––––––––

changes made in documents that *were* provided rather than on any alleged *failure to provide* required documents.

[10]The details of the rescission letters and the circumstances of their sending vary somewhat among these twenty cases. In ten of the cases, Plaintiffs' counsel sent rescission letters on Plaintiffs' behalf after the 2008 Prospectus had been received, noting, inter alia, changes made in the 2008 Prospectus and invoking the 15-day right of rescission allegedly triggered thereby under section 718.503, Florida Statutes. (See Ex. 5 to Pls.' Affs. in Case Nos. 6:08-cv-1248, 6:08-cv-1249, 6:08-cv-1250, 6:08-cv-1251, 6:08-cv-1261, 6:08-cv-1262, 6:08-cv-1268, 6:08-cv-1269, 6:08-cv-1272, and 6:08-cv-1274).

In five of the cases (Case Nos. 6:08-cv-1247, 6:08-cv-1252, 6:08-cv-1265, 6:08-cv-1266, and 6:08-cv-1267), Plaintiffs' current counsel sent rescission letters on those Plaintiffs' behalf that do not mention the 2008 Prospectus and apparently were sent before the Plaintiffs had received the 2008 Prospectus; counsel then sent supplemental rescission letters after the 2008 Prospectus had been received, adding the alterations and amendments in the 2008 Prospectus as an additional alleged basis for rescission. (See Rescission Letters, Ex. 5 to Pls.' Affs. in Case Nos. 6:08-cv-1247, 6:08-cv-1252, 6:08-cv-1265, 6:08-cv-1266, and 6:08-cv-1267).

In five more of the cases, there were also multiple rescission notices. In Case Nos. 6:08-cv-1382 and 6:08-cv-1385, the Plaintiffs themselves—without counsel—sent initial rescission notices after receiving the 2008 Prospectus. (See Notices dated 07/12/2008, Ex. 5 to Pls.' Affs. in these two cases). The identically-worded notices in these two cases state in part: "In accordance with the Florida Condominium Act, we have the right to cancel the contract within 15 days of receiving the revised documents if we do not find the revised documents acceptable." (Id.). Plaintiffs' current counsel sent additional letters requesting termination a few weeks later in these two cases. (See id.).

In Case No. 6:08-cv-1472, the Plaintiff sent her own notice of termination on July 23, 2008, after receiving the 2008 Prospectus. (Ex. 5 to Pl.'s Aff. in Case No. 6:08-cv-1472).

"Defendant has refused to acknowledge that the Purchase Contract[s are] voided and has refused to authorize the release and return to the Plaintiff[s] of Plaintiff[s'] deposit money." (Id. ¶ 105). In Count X, Plaintiffs similarly allege that Defendant breached the Purchase Agreements "by altering the offering in a manner that is material and adverse to the Plaintiff[s] and refusing to allow the Plaintiff[s] to revoke the Purchase Agreement[s] upon timely notice." (Id. ¶ 200).

In their motion, Plaintiffs identify the following as material and adverse alterations in the 2008 Prospectus: (1) reduction in the square footage of the condominium units; (2) reduction in the square footage of "key building amenities," including the pool deck and the fitness center; (3) provision that unit owners will be "separately charged for sewer services"; and (4) provision that each Plaintiff's share of common expenses will include payment for

---

The Plaintiff in that case noted the changes in the offering documents and cited the rescission right given in section 718.503, Florida Statutes. (Id.). Counsel sent a second notice on August 18, 2008. (Id.).

In Case No. 6:08-cv-1383, one of the two Plaintiffs sent two notices on her own rather than through counsel. On July 15, 2008, Plaintiff Malagon sent a letter asking for "release of deposit" based on "structural deficits" in the building; no mention is made of the 2008 Prospectus in that notice. (Ex. 5 to Pl.'s Aff. in Case No. 6:08-cv-1383). On July 23, 2008, Plaintiff Malagon sent another notice after receiving the 2008 Prospectus, stating in part: "In reference to the letter I received about the changes on your offering materials, I would like to inform you that I feel these changes to be adverse to me, and would like to exercise my right to void the contract." (Id.). Then, on August 5, 2008, counsel sent a notice of termination on behalf of Ms. Malagon and her co-Plaintiff, Mr. Romero. (Id.).

And, in case No. 6:08-cv-1626, a law firm other than Plaintiffs' current counsel sent a cancellation letter to Defendant on Plaintiff Heath's behalf on July 18, 2008, stating in pertinent part: "Ms. Heath states that the agreement was signed in 2005, and it is no longer in Ms. Heath's best interest to continue with this agreement." (Ex. 5 to Pl.'s Aff. in Case No. 6:08-cv-1626). It is unclear wither Ms. Heath had received the 2008 Prospectus before that letter was sent. Current Plaintiffs' counsel then sent a second letter in that case on September 10, 2008. (Id.).

participation in a self-insurance fund and payment for costs associated with maintenance of pavers, plantings, and other improvements in the city's right-of-way between the street curbs and the condominium property. Defendant denies that any of these amendments amounts to a "material and adverse alteration" to the offering.

In examining whether a change in a condominium offering amounts to a "material" alteration that is "adverse" to the buyer under section 718.503, courts have looked to dictionary definitions of "materially" and "adverse." As Florida's Third District Court of Appeal has noted, "'[m]aterially' is defined as 'to a significant extent or degree,'" and "'[a]dverse' is defined as '[c]ontrary to one's interests or welfare; unfavorable.'" BB Landmark, Inc. v. Haber, 619 So. 2d 448, 449 (Fla. 3d DCA 1993) (quoting The American Heritage Dictionary 806 & 19 (New College ed. 1981)); accord In re Suncoast Towers E. Asoocs., 241 B.R. 476, 480 (Bankr. S.D. Fla. 1999). Florida courts employ an objective standard in determining whether a change to a condominium offering is "material." As explained by Florida's Fourth District Court of Appeal, "an objective test is appropriate to decide whether an amendment amounts to a 'material' alteration or modification of an offering under section 718.503(1)(a)—would a reasonable buyer under the purchase agreement find the change to be so significant that it would alter the buyer's decision to enter into the contract?" D & T Props., Inc. v. Marina Grande Assocs., Ltd., 985 So. 2d 43, 49 (Fla. 4th DCA 2008). Additionally, "a buyer's motivation is irrelevant in deciding whether the buyer has the right to cancel under the statute." Id. at 50. "[T]he buyer's right to cancel turns on whether the statutory test is satisfied, not on whether the buyer seeks 'to void the agreement due to the loss of resale value caused by a downturn in the real estate market.'" Id. Under these

-8-

standards, the changes that Plaintiffs allege constitute material and adverse alterations are addressed *seriatim*.

### a. Reduced Square Footage of Condominium Units

Plaintiffs assert that "[t]he square footage of each Unit was materially and adversely reduced." (Omnibus Mot. at 7).[11] Plaintiffs assert that the only documents that were provided to them prior to the signing of the Purchase Agreements that set forth the square footages of their units were the brochures, which allegedly overstated those square footages. Plaintiffs further assert that in exhibits to the 2008 Declaration,[12] which they received in July 2008 as part of the 2008 Prospectus, the actual square footages of their units were listed for the first time and are less than as stated in the Brochures.

Defendant denies that the brochures were the only pre-signing documents that indicated the square footage of the units, and Defendant argues that Plaintiffs cannot reasonably base a claim on the square footages indicated in the brochures because those square footages were clearly denoted as "approximate." In any event, Defendant denies that the square footage of the condominium units has been materially reduced from what was represented in 2005, asserting that any difference between the square footages stated in the

---

[11]In this portion of their motion, Plaintiffs refer to and rely on arguments made later in their motion in discussion of Count III. (See Omnibus Mot. at 7-8).

[12]The recording of a Declaration of Condominium is the means by which a condominium is created. See § 718.104(2), Fla. Stat. A copy of "[t]he declaration of condominium, or the proposed declaration if the declaration has not been recorded," must be included as an exhibit to the prospectus that developers are required to provide to purchasers. Id. § 718.504(24)(a). The Declaration for The Paramount was recorded on July 15, 2008. (See Ex. 7 to Robison Aff.). A copy of the proposed Declaration was attached to both the 2005 Prospectus and the 2008 Prospectus that Plaintiffs received.

brochures and the square footages listed in the exhibits to the 2008 Declaration "is caused only by a change in the method of measurement." (Omnibus Mem. in Opp'n at 20). Defendant has submitted hard copies of the actual brochures that were provided to prospective purchasers,[13] and Defendant has also submitted affidavits in support of its contentions.

The initial promotional brochure that was used in May and June 1995 includes floor plans for the various types of units in the building and approximate square footage for each type of unit. (Ex. A to West Aff.; <u>see also</u> West Aff. ¶ 7 (explaining when this brochure was used)). For example, for Unit Type "A1,"[14] the initial brochure indicates "638 net square feet," with an asterisk following it; at the bottom of the page, the asterisk is explained as: "Square footage is approximate. See back for further details." (Initial Brochure, Ex. A to West Aff., filed in hard copy with the court). The back of the brochure states:

> Exclusive sales and marketing by ZOM Residential Services, Incorporated. Oral representations cannot be relied upon as correctly stating the representations of the developer. For correct representations, reference should be made to the documents required by section 718.503 Florida Statutes, to be furnished by a developer to a buyer or lessee. **This offering is made only by the prospectus for the condominium and no statement should be relied upon if not made in the prospectus.** This is not an offer to sell, or solicitation of offers to buy, the condominium units in states where such offer or solicitation cannot be made. Prices, plans and specifications

---

[13]Plaintiffs submitted copies of the brochure pages but not the actual brochures. (<u>See</u> Ex. 3 to each Pl.'s Aff.).

[14]The Court discusses Unit Type A1 only by way of example. The unit types that Plaintiffs contracted to purchase vary. Only the Plaintiffs in Case Nos. 08-cv-1251 and 08-cv-1266 contracted to purchase units that were Unit Type A1.

subject to change without notice.

(Id.) (emphasis added).[15]

In brochures that were used after the sales office opened in July 2005, this same disclaimer appeared on the back. (Exs. B & C to West Aff.; see also West Aff. ¶ 8). These brochures included a looseleaf insert showing a site plan of the building as well as looseleaf pages depicting each type of unit. (See Ex. C to West Aff.). The square footage of the A1 unit was again listed as 638 square feet in these later brochures, (see Ex. C to West Aff., page for Unit A1), and on the back of each looseleaf page appeared a disclaimer that reads in pertinent part:

> STATED DIMENSIONS ARE MEASURED TO THE EXTERIOR BOUNDARIES OF THE EXTERIOR WALLS AND THE CENTERLINE OF INTERIOR DEMISING WALLS AND IN FACT VARY FROM THE DIMENSIONS THAT WOULD BE DETERMINED BY USING THE DESCRIPTION AND DEFINITION OF THE UNIT AS SET FORTH IN THE DECLARATION OF CONDOMINIUM (WHICH GENERALLY ONLY INCLUDES THE INTERIOR AIRSPACE BETWEEN THE PERIMETER WALLS AND EXCLUDES INTERIOR STRUCTURAL COMPONENTS[)]. . . .

(Ex. C to West Aff.).

The documents that Plaintiffs contend indicate reduced unit square footage and

_____

[15]Plaintiffs assert in a footnote in their motion that Defendant is not entitled to rely on the disclaimer on the back of the brochures because it is not in the size of type required by Florida statute. (See Omnibus Mot. at 13 n.4 (citing section 718.503, Florida Statutes)). However, the statute to which Plaintiffs refer requires that brochures provide a disclaimer in a certain size of type advising purchases that they cannot rely on oral representations; it does not provide that a brochure may not advise purchasers that a square footage indicated therein is only an approximation. That statute and any lack of compliance with it certainly do not compel the conclusion that the brochure provided information that was not accurate or that was changed in the 2008 Prospectus.

amount to a material and adverse alteration of the offering are Exhibits 3-1 and 3-2 to the 2008 Declaration. These documents are entitled "Percentage of Ownership of Common Elements and Common Surplus" and "Percentage of Ownership in the Residential Limited Common Elements," respectively, and they list the unit types, the number of units of that type in the building, the "individual unit area," the individual percentage allocation, the total unit area, and the total percentage allocation for each type of unit. (Ex. 5 to Robison Aff.).[16] On these exhibits, the area of Unit Type A1 is given as 580.1 square feet rather than 638 square feet as in the brochures. (See Ex. 5 to Daniel Robison Aff.).

At the bottom of Exhibits 3-1 and 3-2 to the 2008 Declaration is the following statement:

> GIVEN THE NATURE OF CONDOMINIUM OWNERSHIP, THE UNIT BOUNDARIES ARE PRECISELY DEFINED IN SUCH A MANNER SO THAT ALL COMPONENTS OF THE BUILDING WHICH ARE (OR ARE POTENTIALLY) UTILIZED EITHER BY OTHER UNITS OR THE COMMON ELEMENTS ARE EXCLUDED FROM THE UNIT. THIS WOULD EXCLUDE, FOR INSTANCE, ALL STRUCTURAL WALLS, COLUMNS ETC. AND ESSENTIALLY LIMITS THE UNIT BOUNDARIES TO THE INTERIOR AIRSPACE BETWEEN THE PERIMETER WALLS AND EXCLUDES ALL INTERIOR STRUCTURAL COMPONENTS. FOR THE PRECISE UNIT BOUNDARIES, SEE SECTION 3.2 OF THE DECLARATION. FOR YOUR REFERENCE, THE AREA OF THE UNIT, DETERMINED IN ACCORDANCE WITH THESE DEFINED UNIT BOUNDARIES, IS SET FORTH HEREON (AND LABELED AS "UNIT AREA"). PLEASE NOTE THAT THE UNIQUE WAY OF DEFINING THE BOUNDARIES ACTUALLY MAKES THE UNIT APPEAR TO BE SMALLER THAN IT ACTUALLY WOULD BE IF STANDARD ARCHITECTURAL MEASURING TECHNIQUES WERE USED. TYPICALLY,

---

[16]Documents bearing these same titles also appeared as exhibits to the 2005 Declaration, but no unit area was given on the 2005 versions of those exhibits; instead, there were two columns rather than six, listing only "unit type" and the percentage allocation. (See Exs. 3-1 & 3-2 to 2005 Declaration, Ex. 4 to Robison Aff.). Defendant's explanation of the differences in these two versions of these two exhibits is discussed in the text infra.

APARTMENTS ARE MEASURED TO THE EXTERIOR BOUNDARIES OF THE EXTERIOR WALLS AND TO THE CENTERLINE OF INTERIOR DEMISING WALLS, WITHOUT EXCLUDING AREAS THAT COMPONENTS [sic] (THE "TYPICAL MEASUREMENT").  AS SUCH, THE TYPICAL MEASUREMENT WILL BE GREATER THAN THIS UNIT AREA.  NOTE, HOWEVER, THAT MANY OF THE COMPONENTS INCLUDED IN DETERMINING THE TYPICAL MEASUREMENT[] ARE TECHNICALLY COMMON ELEMENTS.

(Ex. 5 to Robison Aff.).  Section 3.2 of the Declaration—referenced in the above-quoted statement and appearing identically in the 2005 and 2008 Declarations—describes the "Unit Boundaries" in pertinent part as follows:

(b)  <u>Perimetrical Boundaries</u>.  The perimetrical boundaries of the Unit shall be the vertical planes of the unfinished interior surfaces of the walls bounding the Unit extended to their planar intersections with each other and with the upper and lower boundaries (and to the extent that the walls are drywall and/or gypsum board, the Unit boundaries shall be deemed to be the area immediately behind the drywall and/or gypsum board, so that for all purposes hereunder the drywall and/or gypsum board shall be deemed part of the Unit and not part of the Common Elements).

(Declaration § 3.2(b)).  Additionally, the Declarations provide that "[i]n cases not specifically covered above, and/or in any case of conflict or ambiguity, the survey of the Units set forth as Exhibit '2' hereto shall control in determining the boundaries of a Unit . . . ."  (Id. § 3.2(d)).

These surveys attached as Exhibit 2 to the Declaration are the documents that Defendant contends described—in addition to the brochures—the square footage of the units prior to the signing of the Purchase Agreements.  These surveys—thirty sheets in total in 2005, thirty-one in 2008—depict the planned building and its units.  Sheets 26-29 depict each unit type; though square footage of these unit types is not stated, wall dimensions are indicated, with a notation that "all dimensions are approximate."  (Ex. 2 to 2005 Declaration,

-13-

Sheets "26 of 30" through "29 of 30").  Unit Type A1 is denoted as roughly rectangular, with the longest dimensions on each side given as 28.2 feet and 21.0 feet.  (Ex. 2 to 2005 Declaration, at Sheet "26 of 30").[17]

Plaintiffs argue that the reduction in square footage for the units seemingly indicated in Exhibits 3-1 and 3-2 to the 2008 Declaration as compared to the brochures amounts to a material and adverse alteration to the offering.  Defendant, however, counters that the unit sizes have not significantly changed and that any appreciable difference is attributable to different measurement methods used.  And, while Plaintiffs assert that Defendant "corrected" its erroneous 2005 square-footage indications with its "new" measurements in Exhibits 3-1 and 3-2 to the 2008 Declaration, Gregory West, a Vice President of Defendant's managing member, explains in an affidavit that in February 2006—during the interim between the execution of the purchase agreements and the anticipated closings—an administrative rule was enacted in Florida, providing that "[a] declaration of condominium in which percentage of ownership is not based upon an equal fractional basis shall include the square footage within each unit or unit type based on the perimetrical boundaries ascribed to each unit or unit type or the dimensions of each unit as elsewhere provided in the declaration of condominium or the survey or graphical description, as well as the total square footage of all units combined."  61 Fla. Admin. Code R. 61B-18.0051, cited in West Aff. ¶ 17.  According to West, before the enactment of this rule, there was no requirement that the Declaration set

_____

[17]In the 2008 version of Exhibit 2 to the Declaration, these dimensions differ from those given in 2005 by .1 feet and .3 feet, respectively—a few inches in each direction.  (See Ex. 2 to 2008 Declaration, at Sheet "26 of 31").

forth the unit square footage; moreover, the rule requires the square footage to be based on perimetrical boundaries of each unit. (West Aff. ¶¶ 17-18). This, asserts Defendant, explains the differences in the 2005 and 2008 versions of Exhibits 3-1 and 3-2 to the Declaration.

West explains in his affidavit that in comparing the measurement on the brochures to the measurement on the recorded condominium documents, "Plaintiffs are comparing apples to oranges." (Id. ¶ 19). West states that the square footage did not change; "[o]nly the method of measurement differs." (Id.). West further notes that the square footage of some of the units purchased by Plaintiffs actually increased rather than decreased. (Id. ¶¶ 19-20).

Having considered the project documents and the parties' submissions, the Court concludes that Plaintiffs have not met their burden of establishing that Defendant has made a material and adverse alteration to the offering with regard to the unit square footage. The parties have submitted competing affidavits regarding the correct method of measurement, and Defendant denies that the habitable space of the condominium units has changed in any appreciable way. (Compare Daniel Robison Aff. ¶ 22 (denying that there is an "industry standard or 'typical measurement' for condominium units" as stated in Defendant's disclaimer), with Paige Close Aff. ¶¶ 6-7 (asserting that Defendant's method of measurement is the customary and standard method),[18] and Gregory West Aff. ¶¶ 16-17 (stating that the

_____

[18]Case law lends support to Defendant's assertions both regarding what is the customary method of measurement and regarding the different methods of measurement explaining the square footage differences. In Kirkpatrick v. Strosberg, 894 N.E.2d 781 (Ill. App. Ct. 2008), which involved similar measurement methods and arguments as those in the

-15-

standard measurement method was used in the brochures and that "[t]he habitable space in the condominium units did not materially change from the date Plaintiffs executed the purchase agreements even though the square footage measurements in the 2008 Declaration facially may appear to be reduced.")).

Defendant has explained the differences in the square footage indications in the documents, and the Court is not persuaded that the dimensions of the units changed in any significant way from what was indicated in the initial documents and what ultimately was built. Moreover, the brochures clearly stated that the square footages given were approximate and that the dimensions were measured to exterior boundaries of exterior walls and the centerline of interior demising walls and would "in fact vary from" what would be indicated in the declaration of condominium, which would include only interior airspace and would exclude interior structural components. Plaintiffs have not established a right to

_____

case at bar, the court affirmed the trial judge's findings after a bench trial, including "that the difference in square footage was in fact due to a difference in measuring methodology and that the methodology used by [the architect] as appropriate and proper." Id. at 789. The court noted that "there was no evidence that the square footage of plaintiffs' units, when measured by the method used by [the architect], was different from that as represented on the floor plans in any of defendants' written materials." Id. at 791. Additionally, as in this case, the Kirkpatrick court noted that the floor plans that the plaintiffs received prior to signing their contracts indicated that dimensions were approximate. Id. at 792. See also McKnight v. Golden Isles Marina, Inc., 366 S.E.2d 830, 832 (Ga. Ct. App. 1988) (finding that condominium unit purchased by plaintiff actually contained 1420 square feet of heated space, as has been represented on the floor plan, when measured from the exterior surface of the exterior walls to the center line of the common walls, and the fact that area when measured from interior wall to interior wall was actually only 1394.7 feet did not render floor plan's square footage statement false or misleading); cf. Franck v. CBL Partners, LLC, No. 2008AP791, 2009 WL 590161 (Wis. Ct. App. Mar. 10, 2009) (affirming judgments entered after jury verdicts for defendant on plaintiff's misrepresentation claim where square footage was measured from space outside of the exterior walls to the center of the interior walls).

revoke under section 718.503 based on a unit square footage change.

### b. Reduced Square Footage of Building Amenities (Pool Deck and Fitness Center)

Plaintiffs next assert that Defendant altered the offering in a material and adverse way in the 2008 Prospectus "by unilaterally reducing the square footage of key building amenities." (Omnibus Mot. at 8). Specifically, Plaintiffs complain that the square footages and capacities of the pool deck and fitness center have been reduced. Defendant responds that the changes to the pool deck and fitness center are not material or adverse, noting that the square footages listed in the 2005 Prospectus were specifically denoted as "approximate."

The 2005 Prospectus contains a "Summary of Certain Aspects of the Offering." (Ex. 1 to Robison Aff.). This Summary states in part that "recreational and other commonly used facilities are intended to be constructed within the Condominium Property," including a pool deck with an "APPROXIMATE SIZE" of 12,000 square feet and an "APPROXIMATE CAPACITY" of 400 persons and a fitness center with an "APPROXIMATE SIZE" of 1,500 square feet and an "APPROXIMATE CAPACITY" of 30 persons. (Id.). The Summary then states: "The facilities described above are intended to be constructed. The design, commencement and progress of any such construction, however, will be in the sole discretion of the Developer. . . . The Developer intends to expend approximately $25,000.00 to provide certain personal property in and around these facilities (to be selected in the sole discretion of Developer)." (Id.).

In the 2008 Prospectus, this Summary page appears with changes thereto indicated with strikeouts and corrections. The pool deck square footage is reduced from 12,000 to

10,749 square feet (a 1251-foot reduction) and its capacity is reduced from 400 to 246 persons. (Ex. 6 to Robison Aff.). The fitness center square footage is reduced from 1500 square feet to 1388 square feet (a 112-foot reduction) and its capacity from 30 to 27 persons. (Id.). Other changes indicated include an increase in the size of the pool from 1,000 square feet to 1,438 square feet; an increase in the capacity of the pool from 20 to 47 persons; and an increase in the size of the club room from 1,000 to 1,285 square feet. (Id.).

In his affidavit, West notes the statements in the 2005 Prospectus that the square footages were approximate and that design would be in Defendant's sole discretion. (West Aff. ¶ 23). Additionally, West states that while Defendant indicated in 2005 that it intended to spend approximately $25,000 on personal property in these areas, it in fact spent more than $100,000 for furniture, fixtures, and equipment for the pool deck and more than $70,000 on such items in the fitness center. (Id. ¶ 24). West also points out that comparison of page 9 of the survey sheets in Exhibit 2 to the 2005 Declaration (part of Ex. 2 to each Pl.'s Aff.) to the same document in the 2008 Declaration (part of Ex. 7 to Robison Aff.) illustrates that the footprint of the pool deck did not change at all—instead, the pool was made 438 square feet larger, and other amenities, including a spa and additional planters, were added. (West Aff. ¶ 25; see also Ex. F to West Aff. (graphical depiction of changes to pool deck area)). West asserts that all of the changes were value-additive rather than adverse. (West Aff. ¶ 25).

With regard to the fitness center, West explains that as stated in the 2005 documents, the design of the fitness center and the adjacent club room were to be in Defendant's sole discretion. (Id. ¶ 26). These two rooms are adjacent to one another, with a dividing wall

between them; during design completion it was decided that the dividing wall would be moved "to allocate more room to the clubroom, because the fitness center was determined to be too large in comparison to industry standards and the reasonable needs of the condominium." (Id.). With the change, the fitness center as built is "more than appropriately sized," and the change was not, according to West, adverse to the residents. (Id.). West further notes that the overall square footage for the fitness center and club rooms combined did not change. (Id.). Defendant has also submitted an excerpt of the state court hearing testimony of a purchaser of a condominium at The Paramount. In that testimony, the purchaser—who closed on and now resides in one of the units—states that the fitness center is adequately sized and that the pool deck area has been improved rather than compromised with the changes to the plans, including the increased pool size. (Tr. of August 13, 2008 State Court Hr'g, Ex. B to Doc. 39, at 273-77).

Plaintiffs have not persuaded the Court that a reasonable buyer would find the changes in the amenity square footage to be material and adverse. As noted by Defendant, Plaintiffs have submitted only bare assertions in their affidavits that the changes are material and adverse to them. (See each Pl.'s Aff. ¶ 8). The statute allows for revocation if an alteration is material and adverse, but the standard is objective, not subjective. On this record, the Court cannot conclude that a reasonable buyer would find the changes material and adverse.[19] Thus, Plaintiffs have not established that they had a right to revoke under

---

[19]This case is distinguishable from others in which courts have found changes in condominium plans to be actionable. In Klinger v. Zaremba Fla. Co., 502 So. 2d 1252 (Fla. 3d DCA 1986), the developer completely eliminated amenities—a jogging path and recreational course. And, in Mastaler v. Hollywood Ocean Group, L.L.C., 10 So. 3d 1114

section 718.503 based on the changes to the pool deck and fitness center.

c.  Billing for Sewer Service

Next, Plaintiffs contend that Defendant made a material and adverse alteration to the offering via the 2008 Prospectus when it made a change regarding sewer service charges. Section 8 of the 2005 Prospectus, titled "Utilities and Certain Services," lists the furnishers of services and utilities including, inter alia, telephone, electricity, and sanitary sewage and waste disposal.  (Ex. 2 to each Pl.'s Aff., § 8).  Beneath this list is the following paragraph:

> Each Unit is or is intended to be separately metered for electric service.  It shall be the Unit Owner's obligation to establish a service account with the utility provider, and thereafter the utility provider will send a separate bill directly for such service.  Electric service to the Common Elements shall be billed directly to the Association, and shall be paid for through assessments of the Association.  Similarly, each Unit Owner must separately arrange for individual telephone service and thereafter shall be billed directly to the service provider.  All other utilities are anticipated to be billed to the Association and shall be paid for through the assessments of the Association.

(Id.).  The only difference in this paragraph that appears in the 2008 Prospectus is that the first sentence reads, with additions underlined:  "Each Unit is or is intended to be separately metered and billed for electric service, which bill may include a separate charge for sewer services in accordance with the policies of Orlando Utility [sic] Commission."  (2008 Prospectus, Ex. 4 to each Pl.'s Aff., § 8) (emphasis in original).

Plaintiffs argue that the 2005 version of section 8 "makes clear that electric service

_____

(Fla. 4th DCA 2009), the developer added nine cabanas to the pool area that took up a large portion of the common area around the pool and were not usable by owners unless they paid $225,000 for such use.

will be separately metered, telephone service will be separately billed and all other utilities, including sewer, will be billed to and paid by the Association through the assessments of the Association and not by the individual Unit owner Plaintiffs." (Omnibus Mot. at 9) (emphasis removed). They assert that in the changed 2008 Prospectus, "Defendant has unilaterally made the material and adverse change that the Plaintiffs will be billed separately for sewer services." (Id.).

Defendant denies this assertion. In his affidavit, West states that "the 2005 Prospectus always contemplated that the Plaintiffs would be charged for sewer. The question which the Prospectus clarified was whether the charge would be sent directly to the unit owner or billed to the Association and paid for through the assessments of the Association." (West Aff. ¶ 27). West notes that paragraph 9(m) of both the 2005 and 2008 Prospectuses states in part that common expenses "include all expenses and assessments properly incurred by the Association for the Common Elements and/or the Association, which are to be shared by the Unit Owners, including, without limitation, . . . (m) costs of water and sewer, electricity, gas and other utilities which are not consumed by and metered to individual Units."

The Prospectus provisions regarding the provision of and payment for sewer service are, at best, confusing. However, the Court need not parse the language or any change made in the 2008 Prospectus because even assuming that Plaintiffs are correct that they now must pay a charge for sewer service that formerly was to borne by the Association, Plaintiffs have not presented any evidence regarding how much a monthly charge for sewer service is; without such evidence, no assessment of materiality can be made. Compare D

& T Props., Inc. v. Marina Grande Assocs., Ltd., 985 So. 2d 43, 48-50 (Fla. 4th DCA 2008) (finding that $90 per month increase for multimedia system was not a material change that gave rise to a right to cancel under section 718.503), with BB Landmark, Inc. v. Haber, 619 So. 2d 448 (Fla. 3d DCA 1993) (finding that increase in price of "extras" from $10,384 to $17,122 was material and entitled buyers to cancel purchase agreement under the statute), and In re Suncoast Towers E. Assocs., 241 B.R. 476  (Bankr. S. D. Fla. 1999) (finding that increase of more than $12,000 per year for utilities was material and adverse).

d.  Self-Insurance and Maintenance of City Right-of-Way

The final allegedly material and adverse alterations asserted by Plaintiffs are two additions to the "Apportionment of Common Expenses and Ownership of the Common Elements" section of the Summary of the Offering in the 2008 Prospectus.  The 2008 Prospectus provides, with additions marked with underlining, that "The Common Expenses include all expenses and assessments properly incurred by the Association for the Common Elements and/or the Association, which are to be shared by the Unit Owners, including, without limitation, . . . (*l*) costs of fire, windstorm, flood, liability and all other types of insurance including, without limitation, and specifically, insurance for officers and directors of the Association and costs and contingent expenses required to participate in a self-insurance fund authorized and approved pursuant to Section 624.462 Florida Statutes; . . . [and] (n) any and all costs associated with maintaining any pavers, plantings, trees, structures, statues, and/or other improvements located within the City's Right of Way from the street curbs to the Condominium Property, if any, pursuant to any agreement and/or covenant entered into with the City." (2008 Prospectus, Ex. 4 to each Pl.'s Aff., § 9).

Plaintiffs aver that with these provisions, Defendant has unilaterally increased the costs to them as purchasers. Defendant, however, denies this assertion.

Defendant avers that the addition of the self-insurance provision to subsection (*l*) of section 9 of the Prospectus merely "provides the purchasers with a statutory option for insurance coverage as a result of a revision to Chapter 6[24],[20] Florida Statutes." (Opp'n Mem. at 25). In his affidavit, Gregory West explains, "The 2008 Prospectus did not require Plaintiffs to participate in a self-insurance fund. To the contrary, the 2008 Prospectus only provides the Plaintiffs with a statutory option for insurance coverage, but it in no way modified how the condominium is insured." (West Aff. ¶ 30).

Although Defendant does not elaborate on the revision to the Florida Statute or explain the "statutory option," the Court's own cursory review of section 624.462, Florida Statutes, and its history reveals that the statute was amended in 2007 and provides in part that "[a]ny group of persons may form a commercial self-insurance fund for the purpose of pooling and spreading liabilities of its group members in any commercial property or casualty risk or surety insurance." § 624.462(1), Fla. Stat. The Florida House of Representatives Staff Analysis on the bill that led to the 2007 change states in part that "[t]his bill amends laws relating to insurance for community associations to . . . [p]rovide implementing provisions for condominium associations, cooperative associations and homeowners' association[s] to participate in self-insurance funds authorized by the January 2007 special

---

[20]Defendant's Opposition Memorandum refers to Chapter 642, Florida Statutes, and section 642.462, Florida Statutes. (See Opp'n Mem. at 25). Section 642.462 does not exist, however. The correct chapter is Chapter 624 and the correct section is section 624.462, as stated in section 9(*l*) of the 2008 Prospectus.

session." Fla. H.R. HB 7031 (2007) Staff Analysis (Mar. 16, 2007). The Court assumes that Defendant's argument is that the new provision in the 2008 Prospectus means that if the condominium association elects to participate in a self-insurance fund, costs associated with that will be borne as "common expenses." In any event, as with the sewer service provision, Plaintiffs have not presented any evidence regarding the added cost to them that would allegedly result from this provision, and they are not entitled to summary judgment on the issue of whether they have a right to revoke based on this alleged change.

With regard to the provision in Section 9(m) of the 2008 Prospectus, Defendant explains that in the 2005 Prospectus common expenses were defined as including "any and all costs, expenses, obligations (financial or otherwise) and/or liabilities of the Association and/or running with the Land pursuant to any restriction, covenant, condition, limitation, agreement, reservation and easement now or hereafter recorded in the public records." 2005 Prospectus § 9(i). According to Defendant, the modification in the 2008 Prospectus with the new § 9(n) "is now merely providing more specific detail" of the City Right of Way Maintenance Agreement that was already of the type described in 2005's § 9(i).[21] (Opp'n Mem. at 26). West explains in his affidavit that "[t]he cost associated with the City's Right-of-Way Maintenance Agreement is exactly the type of agreement that was defined as a Common Expense" in the 2005 Prospectus. (West Aff. ¶ 31). West states that "[t]he costs associated with the maintenance of the City's right-of-way were always contemplated and were generally described in the 2005 Prospectus" and "[t]he current budgeted cost to

---

[21]In the 2008 Prospectus, no change was made to the language of § 9(i).

maintain the City's right-of-way is marginal–merely $7.57 (approximately) per year for each unit." (Id. ¶ 32).

Even assuming that the Maintenance Agreement with the City is a new item that was not disclosed in the 2005 Prospectus, the additional annual charge per unit for this item is not a material change to the offering. Plaintiffs have not presented any evidence as to the amount of the increase allegedly caused by this provision, so for purposes of this motion the Court accepts the amount estimated in West's affidavit—which is not contradicted by any evidence from Plaintiff—of $7.57 per year per unit. This is a de minimis amount that is not material. See D & T Props., 985 So. 2d at 48-50 (finding $90 per month increase not material).

e. Conclusion as to Counts II and X

In sum, Plaintiffs have not established entitlement to summary judgment on Count II or Count X. Plaintiffs have not presented evidence supporting a finding that the additions or changes in the 2008 Prospectus were material and adverse alterations to the offering such that Plaintiffs were entitled to revocation within 15 days as set forth in section 718.503, Florida Statutes.

2. Count III (Section 718.506, Florida Statutes)

In Count III, Plaintiffs allege that Defendant violated section 718.506, Florida Statutes, which provides in pertinent part as follows:

> Any person who, in reasonable reliance upon a material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus,

> brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction.

§ 718.506(1), Fla. Stat. Plaintiffs assert that Defendant published information regarding what the square footage of their condominium units would be but knew or should have known "that the actual Unit square footage would be significantly less." (Doc. 13 ¶¶ 109-11). Plaintiffs contend that they reasonably relied on Defendant's statements regarding unit square footage, and they seek to rescind their Purchase Agreements based on Defendant's alleged misleading statements.

Plaintiffs' contention regarding the square footage representations in the brochures has already been addressed in the discussion of Count II earlier in this Order. On this record, at a minimum there are disputes regarding the typical method of measurement, whether the square footages indicated by Defendants are accurate, and whether the square footage has changed at all. Plaintiffs are not entitled to summary judgment on Count III.

### 3. Count I—ILSFDA

In Count I, Plaintiffs allege that Defendant has committed numerous violations of the ILSFDA, 15 U.S.C. §§ 1701-1720. "The ILSFDA was intended to curb abuses accompanying interstate land sales." Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1448 (11th Cir. 1985). It "is an antifraud statute using disclosure as its primary tool, much like the securities laws." Id. at 1446-47.

Subject to specific listed exemptions,[22] the ILSFDA generally requires developers to make certain disclosures to purchasers of subdivided real estate prior to the signing of a purchase agreement. For example, 15 U.S.C. § 1703(a)(1)(B) provides that "[i]t shall be unlawful for any developer . . . to sell . . . any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser . . . in advance of the signing of any contract or agreement by such purchaser." The statute uses the term "lot," which is not defined therein, but the Eleventh Circuit Court of Appeals expressly held in Winter that the statute covers condominiums as well as "raw land," with each condominium unit constituting a "lot." 777 F.2d at 1447-48. In doing so, the court relied on the interpretation of the statute by the Department of Housing and Urban Development ("HUD") as including condominiums. Id. at 1448-49.[23]

Plaintiffs allege myriad ILSFDA violations in Count I of their Amended Complaints, most of which pertain to alleged deficiencies in the Property Report that Defendant provided to them pursuant to § 1703(a)(1)(B) quoted above. Defendant makes several arguments in opposition to Plaintiffs' ILSFDA claims, including that those Plaintiffs who bought their units as "investors" have no claims under ILSFDA; that Plaintiffs' claims are untimely; that Plaintiffs did not plead any violations of 15 U.S.C. § 1703(a)(2) and cannot recover on any such claim; and that any claims that are properly pled fail on their merits. These contentions

---

[22]Exemptions are contained in 15 U.S.C. § 1702.

[23]Additionally, as noted in Winter, a HUD regulation defined "lot" as "any portion, piece, division, unit, or undivided interest in land . . . if the interest includes the right to the exclusive use of a specific portion of the land." See 777 F.2d at 1447 (quoting 24 C.F.R. § 1710.1 (1985)). This regulation still defines "lot" in this manner today.

are addressed in turn.

a.  "Investors"

Defendants argue that those Plaintiffs who entered into their Purchase Agreements as "investors" cannot bring any claims under the ILSFDA because the ILSFDA contains an exemption for purchases by such investors.  Defendant asserts that Plaintiffs Scott (Case No. 6:08-cv-1252) and Cohen (Case No. 6:08-cv-1265) "admit they are investors" because they checked a box on an exhibit to their Purchase Agreements denoting "investor status."[24] Defendant also avers, based on its review of property records indicating multiple purchases and sales of property in a short period of time by Plaintiffs Bullard (Case No. 6:08-cv-1274), Heath (Case No. 6:08-cv-1626), Pyle (Case No. 6:08-cv-1247), Shuberg (Case No. 6:08-cv-1248), Malagon/Romero (Case No. 6:08-cv-1381), and Warren (Case No. 6:08-cv-1261), that these Plaintiffs are also "investors" whose transactions are exempted from the ILSFDA's requirements.

In support of this argument, Defendant relies on an ILSFDA exemption (15 U.S.C. § 1702(a)(7) and a regulation (24 C.F.R. § 1710.14(a)(3)).  However, these provisions do not necessarily exempt sales made to buyers who merely check a box indicating "investor status," who intend to lease their unit to a third party, or who merely buy their units for the purpose of investment.  By their very terms, these provisions exempt, respectively, "the sale

---

[24]The form to which Defendants refer is Exhibit B to each Plaintiff's Purchase Agreement, which itself is attached as Exhibit 1 to each Plaintiff's Amended Complaint.  The form is titled "Purchaser's Representation Regarding Use of Unit" and provides a place for a purchaser to check either "Residential occupancy by Purchaser or Purchaser's family member" or "Investor status with the intention of leasing to a third party."  (See Ex. B to Purchase Agreements).

or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings or for the purpose of resale or lease of such lots to persons engaged in such business," 15 U.S.C. § 1702(a)(7), and "[t]he sale of lots to a person who is engaged in a bona fide land sales business," 24 C.F.R. § 1710.14(a)(3). Defendant cites no case interpreting these provisions in the manner it proposes. In the lone case cited by Defendant in alleged support of this argument, Wigand v. West City Partners, Inc., No. 07-61492-CIV, 2008 WL 384394, at *1 (S.D. Fla. Feb. 11, 2008), the court stated only that "whether or not a Plaintiff is an 'investor' within the meaning of [the statutory and regulatory exemptions] will necessarily be a specific factual question, based on each of the various Plaintiffs' individual circumstances."

On the contrary, in the case in which the Eleventh Circuit Court of Appeals held that the ILSFDA applies to condominium sales, the court found that there was a genuine issue of material fact as to whether the buyer was "in the land sales business"—quoting the regulation and referring to the § 1702(a)(7) exemption as well–and then noted that the HUD guidelines issued in 1979 expressly stated that "'[t]he sale or lease of lots to an individual who is buying the property for investment (to be sold at some unforeseeable time in the future) would **not** be exempt under this provision.'" Winter, 777 F.2d at 1450 & n.16 (quoting 44 Fed. Reg. 24,018 (1979)) (emphasis added); see also id. at 1446 n.5. Although the 1979 guideline is no longer in effect, HUD's position regarding the scope of this exemption remains the same today. See Supplemental Information to Part 1710: Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, http://www.hud.gov/offices/hsg/ramh/ils/ilsexemp.cfm (providing, in discussing the §

1702(a)(7) exemption, that "[t]he sale to a non-broker who is buying a lot for investment with indefinite plans for resale . . . is **not** exempt" and, in discussing 24 C.F.R. § 1710.14(a)(3), that "[t]he sale or lease of lots to an individual who is buying the property for investment, to be sold at some unforeseeable time in the future, would **not** be exempt under this provision") (emphasis added).[25]  Courts have recognized the limited scope of the "sale to developer" statutory exemption and the "bona find land sales business" regulation, noting the plain language of these provisions.  See, e.g., Jankus v. Edge Investors, L.P., 619 F. Supp. 2d 1328, 1343-44 (S.D. Fla. 2009); Pigott v. Sanibel Dev., LLC, 576 F. Supp. 2d 1258, 1270-71 (S.D. Ala. 2008) (discussing the regulation); N & C Props. v. Pritchard, 525 So. 2d 1346, 1350 (Ala. 1988) (noting, in rejecting argument "that the investors purchased the condominiums with the intent to resell to developers" as required for applicability of the § 1702(a)(7) exemption, that there was no evidence of any such intent).  Thus, purchase as

_____

[25]As explained by another judge in this district, "[i]n 1979, the Secretary published an interpretive rule regarding ILSFDA, . . . 44 Fed. Reg. 24010." Van Hook v. Residences at Coconut Point, LLC, No. 2:07-cv-796-FtM-29SPC, 2008 WL 2740331, at *2 (M.D. Fla. July 10, 2008)).  This was the rule cited by the Eleventh Circuit Court of Appeals in Winter in 1985.  See 777 F.2d at 1450 n.16.  "That rule was superceded in 1984, 49 Fed. Reg. 31375 (1984), and eventually rescinded on March 27, 1996, as part of a streamlining process, 61 Fed. Reg. 13596 (1996).  The information was moved to the HUD website . . . ." Van Hook, 2008 WL 2740331, at *2.  The current guidance provided on the HUD website, as cited in the text, is consistent with the 1979 Guideline.

In sum, HUD's position has not changed since the Eleventh Circuit referred to the 1979 HUD Guidelines in its Winter opinion when discussing the applicability of the § 1702(a)(7) exemption and the regulation.  See 777 F.2d at 1450 & n.16.  In light of the Eleventh Circuit's Winter decision and the fact that HUD's interpretation has not changed in the interim, this Court is somewhat troubled by Defendant's position regarding this exemption.  Again, Defendant has provided no support for the argument that the exemption applies to a mere "investor" rather than someone whose activities satisfy the terms of the statute and regulation.

an "investor" is alone insufficient for the § 1702(a)(7) exemption to apply.

Plaintiffs state in their affidavits that they are not developers and are not engaged in the land sales business. (See Pls.' Affs. ¶ 14).[26] Defendant has cited no evidence to the contrary other than the checking of the "investor status" box by some of the Plaintiffs and some property appraiser records reflecting purchases and sales of multiple properties by some of the Plaintiffs. The Court cannot conclude on this record that any of the Plaintiffs' transactions is exempt from ILSFDA's requirements under 15 U.S.C. § 1702(a)(7). This portion of Defendant's argument on these claims is not well-taken.

b. Timeliness

Defendant also argues that at least some of Plaintiffs' ILSFDA claims are untimely and therefore not viable. This argument has merit.

ILSFDA provides for two categories of lawsuits by purchasers: actions for violations by a developer of § 1703(a), see 15 U.S.C. § 1709(a), and actions "to enforce any right under subsection (b), (c), (d), or (e) of section 1703," id. § 1709(b). While Plaintiffs' Amended Complaints cite many sections of ILSFDA, the only potentially viable claims that Plaintiffs have are claims for violations of 15 U.S.C. § 1703(a)—not to "enforce rights" under subsections (b), (c), (d), or (e).[27] This is so because the only rights that subsections (b), (c),

_____

[26]These statements appear in paragraph 14 of most of the affidavits. However, there is some variation in the contents of the affidavits and the paragraphs in which statements regarding Plaintiffs' intentions for the units are made. In any event, as noted in the text Defendant has not established the applicability of this exemption to any of the Plaintiffs.

[27]Plaintiffs cite § 1703(c) and (d) in their Amended Complaints, but not § 1703(b) or (e).

-31-

(d), or (e) gave to Plaintiffs were the rights to revoke within, at most, two years of the signing

of the Purchase Agreements.[28]  It is undisputed that none of the Plaintiffs sought to revoke

his or her Purchase Agreement within two years of its signing.[29]  Instead, the first attempts

at such revocation came in July 2008—long after the signing of Purchase Agreements in

mid-2005.  Therefore, Plaintiffs have no right to revoke under these subsections, nor do they

have a cause of action to "enforce" any such right in a lawsuit pursuant to § 1709(b).

Thus, the only type of ILSFDA action that Plaintiffs can potentially pursue is an action

under 15 U.S.C. § 1709(a) for violations by Defendant of § 1703(a).  However, even this set

of potential claims is further limited by Plaintiffs' own pleading.  Although Plaintiffs argue in

their summary judgment motion that Defendant "violated 15 U.S.C. § 1703(a)(2)," (see

Omnibus Mot. at 26), Defendant correctly points out in its opposition memorandum that

Plaintiffs did not plead any violation of 15 U.S.C. § 1703(a)(2) in their Amended Complaints.

Plaintiffs allege numerous specific violations and cite numerous specific statutory provisions

---

[28]The right to revoke provided by 15 U.S.C. § 1703(b) lasts for seven days or, pursuant to Florida law, fifteen days.  See 15 U.S.C. § 1703(b) (providing for right to revoke purchase agreement within seven days or within such time as may be provided by state law); § 718.503, Fla. Stat. (providing right to revoke within fifteen days of signing of purchase agreement).  Subsections (c) and (d) provide a right to revoke within two years of signing.

[29]Although at times in its opposition memorandum Defendant characterizes the two-year revocation period as a "statute of limitations" (see, e.g., Mem. in Opp'n at 5), the time period is not a statute of limitations.  The limitations periods for ILSFDA actions are set forth in 15 U.S.C. § 1711, and a three-year period from the time of the signing of the purchase agreement applies to most claims.  As this court and others have held in prior cases, the two-year revocation period provided for in 15 U.S.C. § 1703(c) and (d) is not a limitations period but part and parcel of the right that the statute provides.  In other words, the statute gives purchasers two years to revoke; if they do not do so within that time period, their right under that section expires by its own terms.  It is not a statute of limitations pertaining to when a lawsuit must be filed.

in Count I, but § 1703(a)(2) is not mentioned at all.[30]  Thus, Plaintiffs clearly may not pursue

or obtain summary judgment on any such claim.  The only potential claims thus are claims

for violation of § 1703(a)(1).[31]

c.  Merits of Claims Under the ILSFDA

ILSFDA provides in 15 U.S.C. § 1703(a)(1)(B) that a developer must, in advance of

the signing of a purchase agreement, furnish to the purchaser a printed property report

meeting the requirements of 15 U.S.C. § 1707.  Section 1707, in turn, provides that the

property report "shall contain such of the information contained in the statement of record,

and any amendments thereto, as the Secretary [of HUD] may deem necessary, but need

not include the documents referred to in paragraphs (7) to (11), inclusive, of section 1705."[32]

_____

[30]Moreover, 15 U.S.C. § 1703(a)(2) proscribes fraudulent conduct, and fraud claims must be pled with particularity.  See Fed. R. Civ. P. 9(b).  These claims have not been pled at all, much less with the requisite particularity.

[31]Moreover, one of the Plaintiffs has no claims under ILSFDA that are not barred by the statute of limitations.  The Act contains its own statutes of limitations for different types of claims.  For all claims except those for violation of some portions of § 1703(a)(2), an action must be brought within "three years after the signing of the contract of sale."  15 U.S.C. § 1711(a)(1).  Because no violations of § 1703(a)(2) have been pled, all of Plaintiffs' potential claims are subject to this three-year limitation period.  One of the Plaintiffs, however, did not file suit within three years of the signing of her Purchase Agreement.  Case Number 6:08-cv-1472, filed by Plaintiff Carter, was filed on August 27, 2008.  (See Doc. 1 in Case No. 6:08-cv-1472).  However, the Purchase Agreement in that case was signed on August 7, 2005—more than three years prior to the filing of suit  (See Ex. 1 to Doc. 1 in Case No. 6:08-cv-1472).  Thus, there are no ILSFDA claims in Case No. 6:08-cv-1472 that are not time-barred.  The discussion in the text regarding potentially viable ILSFDA claims does not apply to Case No. 6:08-cv-1472.

[32]The statement of record is the document by which a subdivision is registered with the Secretary.  See 15 U.S.C. § 1704.  Section 1705 sets forth, in twelve numbered paragraphs, a list of the information that must be contained in the statement of record.  The accompanying regulations then provide that "[t]he Statement of Record consists of two

15 U.S.C. § 1707(a).  Further, the property report "shall also contain such other information as the Secretary may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of purchasers."  Id.  The Secretary has promulgated regulations regarding the property report.  See 24 C.F.R. pt. 1710, subpart B.

In their Amended Complaints, Plaintiffs allege that Defendant did not include all of the required information in the Property Reports that were furnished to Plaintiffs.  Plaintiffs set forth three alleged deficiencies.

(1)  Cost Sheet (24 C.F.R. § 1710.117)

The regulations require provision of a cost sheet and set forth the format therefor.  See 24 C.F.R. § 1710.117.  Plaintiffs acknowledge that Defendant provided them with a cost sheet, but they assert that the cost sheet did not include all of the items required by the regulations.  Plaintiffs note that 24 C.F.R. § 1710.117(a)(2) provides that "[a]ll amounts for cost sheet items will be entered before the purchaser signs the receipt."  Plaintiffs complain that many of the spaces for amounts on the cost sheet that Defendant provided were left blank or were listed as "undetermined."

Defendant responds that HUD approved and reviewed its Property Report, which contained these "undetermined" indications at the time of approval.  Additionally, Defendant states that when the Purchase Agreements were executed in 2005, it was not possible to project what these amounts would be.  Defendant supposes that if it had "guessed" at the

_____

portions:  the Property Report portion and the Additional Information and Documentation portion."  24 C.F.R. § 1710.100(a).  "The version of the Property Report delivered to prospective lot purchasers shall be verbatim to that found effective by the Secretary . . . ."  Id. § 1710.102(m).

appropriate amounts to fill in on this cost sheet, surely Plaintiffs would have found fault with Defendant for that as well.

Plaintiffs are not entitled to relief based on any deficiency in the cost sheet that they were provided. The form for the cost sheet that appears in the regulations states at the top: "In addition to the purchase price of your lot, there are other expenditures which must be made. Listed below are the major costs. There may be other fees for use of the recreational facilities. All costs are subject to change." 24 C.F.R. § 1710.117(a). The Cost Sheet that Defendant provided to Plaintiffs included this provision,[33] with the last sentence in all capital letters for emphasis, even though such emphasis is not required by the regulation. (See Ex. 1 to each Pl.'s Aff.).

Plaintiffs have not stated how, if at all, they have been damaged by the "undetermined" entries in the cost sheet. Moreover, given that the regulations contemplate—and in fact require—that the sheet state that "[a]ll costs are subject to change," the Court is at a loss as to how Plaintiffs could have been damaged by the "undetermined" entries. The Court can only conclude that the intent of the regulation is to require the developer to list the categories of major costs that buyers will face so that the buyers will be on notice of the types of such expenses; Defendant did so, listing seven areas of major costs even though the regulation only lists three (plus "other") in its example. Absent a showing of some type of damage from the "undetermined" amount—which again, does not seem possible in light of the "subject to change" provision, Plaintiffs' claim with

---

[33]Defendant used the word "unit" instead of "lot" in the first sentence, but otherwise the wording at the top of Defendant's cost sheet is identical to that in the regulation.

regard to the alleged cost sheet deficiencies fails.

<u>(2)  Receipt, Agent Certification, and Cancellation Page (24 C.F.R. § 1710.118)</u>

Plaintiffs next assert that the property reports that they received were deficient because on the"Receipt, Agent Certification and Cancellation Page" required by 24 C.F.R. § 1710.118, Defendant failed to list "the Lot, Block and Section" describing the unit.  This argument is completely without merit.

The sample form for the "Receipt, Agent Certification and Cancellation Page" in 24 C.F.R. § 1710.118(a) does provide lines for "Lot," "Block," and "Section."  The page provided to Plaintiffs instead lists "Unit _____ of the Paramount on Lake Eola, a Condominium," with the appropriate unit number filled in for each respective purchase.  (<u>See</u> Ex. 1 to each Pl.'s Aff.).  Although Plaintiffs faults Defendant for the manner in which it completed this page, the Court finds no lack of compliance.  Obviously, a condominium building is not a typical subdivision the parts of which can be described with a lot, block, and section.  And, as discussed earlier, the Eleventh Circuit held in <u>Winter</u> that the ILSFDA covers condominiums, with each unit constituting a "lot" under the statute.  <u>See</u> 777 F.2d at 1447-48.  Thus, by filling in the Unit number, Defendant filled in the lot number, and the block and section do not apply.

<u>(3)  Statement of General Terms and Conditions (15 U.S.C. §§ 1707 and 1705(4))</u>

Finally, Plaintiffs assert that Defendant failed to include in the Property Report a "statement of the general terms and conditions, including the range of selling prices or rents at which it is proposed to dispose of the lots in the subdivision."  (Omnibus Mot. at 24-25). Plaintiffs contend that such a statement is required by 15 U.S.C. §§ 1707 and 1705(4) and

that Defendant failed to make any reference to a range of selling prices in the Property Report.

The Court finds no requirement in §§ 1707 and 1705(4) that such information be included in the Property Report. Plaintiffs assert in their omnibus motion that 15 U.S.C. § 1707 provides that the property report must "include the items set forth in 15 U.S.C. § 1705(1) through (6)." (Omnibus Mot. at 21). This is not, however, what § 1707 states. As earlier noted, § 1707 provides that the property report "shall contain such of the information contained in the statement of record as the Secretary may deem necessary, but need not include the documents referred to in paragraphs (7) to (11)" of § 1705—the statute that sets forth the requirements for the statement of record. The fact that § 1707 states that the report need **not** include the items in paragraphs (7) to (11) of § 1705, however, does **not** mean that it **must** include the items in paragraphs (1) through (6) of § 1705 as alleged by Plaintiffs. If such a requirement exists, it does not derive from § 1707. Plaintiffs have not directed the Court to any other source for such a requirement. Thus, Plaintiffs have not demonstrated a violation of § 1703(a)(1)(B) based on a failure to include a range of selling prices in the Property Report.[34]

### d. Conclusion as to Count I

In sum, Plaintiffs have not established entitlement to summary judgment in their favor on any claims under the ILSFDA.

### 4. Count VI (FDUTPA)

---

[34]In any event, Defendant notes that a range of selling prices is included in the Property Report in the "taxes" section.

In Count VI, Plaintiffs bring a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), section 501.201 et seq., Florida Statutes. Plaintiffs note that FDUTPA provides in part that a FDUTPA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices." § 501.203(3)(c), Fla. Stat. They then assert that Defendant has violated the FDUTPA because it has violated the ILSFDA and chapter 718, Florida Statutes.

Because Plaintiffs rely in this Count on alleged violations of other statutes, and because Plaintiffs have not established entitlement to summary judgment based on any such other violations, Plaintiffs' motion for summary judgment on the FDUTPA claim in Count VI fails as well.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Plaintiffs' Omnibus Motion for Summary Judgment—filed with the following docket numbers in the following twenty cases—is **DENIED in all respects**:

> Doc. 37 in Case No. 6:08-cv-1247-Orl-28KRS,
> Doc. 37 in Case No. 6:08-cv-1248-Orl-28KRS,
> Doc. 39 in Case No. 6:08-cv-1249-Orl-28KRS,
> Doc. 34 in Case No. 6:08-cv-1250-Orl-28KRS,
> Doc. 38 in Case No. 6:08-cv-1251-Orl-28KRS,
> Doc. 37 in Case No. 6:08-cv-1252-Orl-28KRS,
> Doc. 34 in Case No. 6:08-cv-1261-Orl-28KRS,
> Doc. 34 in Case No. 6:08-cv-1262-Orl-28KRS,
> Doc. 36 in Case No. 6:08-cv-1265-Orl-28KRS,
> Doc. 39 in Case No. 6:08-cv-1266-Orl-28KRS,
> Doc. 37 in Case No. 6:08-cv-1267-Orl-28KRS,
> Doc. 39 in Case No. 6:08-cv-1268-Orl-28KRS,
> Doc. 35 in Case No. 6:08-cv-1269-Orl-28KRS,

Doc. 35 in Case No. 6:08-cv-1272-Orl-28KRS,
Doc. 39 in Case No. 6:08-cv-1274-Orl-28KRS,
Doc. 33 in Case No. 6:08-cv-1382-Orl-28KRS,
Doc. 36 in Case No. 6:08-cv-1383-Orl-28KRS,
Doc. 34 in Case No. 6:08-cv-1385-Orl-28KRS,
Doc. 31 in Case No. 6:08-cv-1472-Orl-28KRS, and
Doc. 31 in Case No. 6:08-cv-1626-Orl-28KRS.

The requests for oral argument with regard to these motions are **DENIED as moot**, as are

the Motions for Leave to File Supplemental Authority filed by Defendant in these cases.

**DONE** and **ORDERED** in Orlando, Florida this 17th day of August, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party